UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JENNIFER ANTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 4:08-CV-514 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On May 18, 2005, plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq. (Tr. 55-60). Plaintiff claimed disability due to chronic obstructive pulmonary disease, asthma, heart disease, arthritis, fibromyalgia, migraine headaches, poor circulation in legs, and high blood pressure. (Tr. 87). She also alleged that she becomes diabetic when taking steroids. (Tr. 87). Plaintiff alleges an onset date of March 3, 2005. (Tr. 88). The applications were initially denied by defendant. (Tr. 42-46). Plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on August 22, 2006. (Tr. 41, 356). Plaintiff testified at the hearing in response to questions posed by the ALJ and by plaintiff's counsel. (Tr. 356-365). The ALJ also heard testimony from Jeff Magrowski, a vocational expert. (Tr. 366-368).

On October 4, 2006, the ALJ found that plaintiff was not disabled and denied her claims for benefits. (Tr. 12-16). Plaintiff requested review of the ALJ's decision by the

Appeals Council.  (Tr. 7-8).  On February 19, 2008, the Appeals Council denied plaintiff's request.  (Tr. 2-5).  Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

Plaintiff was born on September 8, 1948.  (Tr. 55).  At the time of the hearing, plaintiff was married and lived in an apartment with her husband.  (Tr. 55, 79).  She received her GED certificate in 1990.  (Tr. 93).  From 1999 through March of 2005, plaintiff was employed at St. Elizabeth's Adult Day Care as an activity director.  (Tr. 64, 88).  Her duties included scheduling activities for the adults in the day care program.  (Tr. 88).  Plaintiff supervised six aides who helped with all of the programs.  (Tr. 88).  She also regularly performed other duties, including giving showers to the clients, ordering food for them, assisting them in the bathroom, and any other tasks which needed to be completed.  (Tr. 64, 88).  Her employment required her to lift fifty pounds frequently and up to one hundred pounds or more when lifting adult participants in and out of their seats for meals.  (Tr. 89).  She was also required to lift the participants into and out of their vehicles.  (Tr. 89).  Plaintiff claims that her job required her to crouch for approximately two hours per workday, walk for seven hours, sit for one hour, and bend for two hours.  (Tr. 89).

Plaintiff stopped working at the daycare on March 3, 2005, because she was no longer able to lift the patients and was suffering from migraines and asthma attacks.  (Tr. 88).  At the hearing, she testified that severe pain in her feet and legs was the number one reason why she had to quit her job.  (Tr. 359).  She also testified that she had severe pain in her arms when lifting them above her head.  (Tr. 360).  Plaintiff also claimed that her back pain keeps her from working.  (Tr. 360).  She also contends that she suffers from breathing problems.  (Tr. 361).  She testified that her asthma

–2–

attacks occur three to four times a week, although she acknowledged that it varies greatly. (Tr. 361). Some weeks she does not have any asthma attacks. (Tr. 361). Plaintiff testified that she quit smoking two months prior to the hearing. (Tr. 361). Plaintiff also testified regarding her stomach pains resulting from chronic constipation. (Tr. 362). At its worst, the constipation causes such severe pain that plaintiff is unable to walk. (Tr. 362). The pain plaintiff experiences from her ailments forces her to lay down for approximately four to six hours each day. (Tr. 363-64). She contends that the pain has increased since she stopped working. (Tr. 365).

Plaintiff claims that she can walk for only ten or fifteen minutes without resting. (Tr. 80). She also claims that she needs to rest after walking about fifty feet. (Tr. 84). Plaintiff does not use any crutches or other walking aides. (Tr. 85). In addition to a limited ability to walk, plaintiff also claims that she has difficulties lifting, squatting, bending, standing, kneeling, climbing stairs, using her hands, and completing tasks. (Tr. 84). She claims that she cannot lift more than twenty-five pounds. (Tr. 84). Her back hurts when she stands for two long, and she has difficulty getting up after bending over or squatting. (Tr. 84). Plaintiff denied that she was limited in her abilities to sit or reach. (Tr. 84).

Plaintiff is not limited in her ability to take care of herself, although she does claim that everything takes longer to do. (Tr. 80). At the hearing, she testified that she does not do much cooking due to her inability to stand for long periods of time. (Tr. 364). However, she can heat up frozen dinners and make sandwiches and other simple meals. (Tr. 81). She claims that she prepares her own meals approximately three times per week. (Tr. 81). Her alleged disabilities have caused her to eat out more often. (Tr. 81). Plaintiff is able to drive and goes grocery shopping twice a

month for about two hours each time.  (Tr. 82).  Her granddaughter helps her with grocery shopping, cooking and cleaning.  (Tr. 365).

Plaintiff's typical day begins around 9:00 a.m.  (Tr. 79).  She drinks coffee in the morning to help her feel better.  (Tr. 79).  She performs light housekeeping tasks, such as washing dishes, making her bed, and straightening the apartment.  (Tr. 79).  She is forced to rest in between these tasks.  (Tr. 79).  Plaintiff testified at the hearing that it is now very difficult for her to do much housework due to her pain.  (Tr. 364).  On her function report, she claimed that she could perform light laundry, but needed help carrying the laundry to the basement.  (Tr. 81).  In the evening, plaintiff watches television and talks with family or friends on the phone.  (Tr. 79).  She goes to bed at approximately 11:00 p.m.  (Tr. 79).  Plaintiff claims that she often wakes up in the night due to her pain.  (Tr. 80).

The ALJ heard testimony from Jeff Magrowski, a vocational expert, who testified that plaintiff would be able to perform work as an activity director, as that occupation is normally performed.  (Tr. 366).  However, Mr. Magrowski testified that plaintiff's description of her job exceeded the physical requirements normally associated with an activity director position.  (Tr. 366).

### III. Medical Records

### A.    Treatment Notes Prior to Alleged Onset Date

Plaintiff's medical records date back to February 10, 1992, when she was hospitalized with complaints of a severe cough with wheezing and shortness of breath.  (Tr. 142).  Barry Brown, M.D., diagnosed plaintiff with asthmatic bronchitis, and treated plaintiff with steroids.  (Tr. 142).  The steroids caused plaintiff to develop

hyperglycemia.[1]  (Tr. 142).  Dr. Brown believed that, once the steroids were reduced, plaintiff's blood sugar levels would come down.  (Tr. 142).   Plaintiff was discharged on February 19, 1992, and was much improved.  (Tr. 142).

On December 4, 1998, plaintiff was admitted to the hospital due to chest pain. (Tr. 141).  She was seen by Dr. Brown, who noted tenderness on plaintiff's chest during physical examination.  (Tr. 141).  An x-ray of plaintiff's chest was normal.  (Tr. 141).  An electrocardiogram showed normal sinus rhythm of the heart.  (Tr. 141).  Dr. Brown opined that plaintiff's chest pain was muscular in origin.  (Tr. 141).   Plaintiff's diagnosis was chest pain due to musculoskeletal origin, irritable bowel syndrome[2], and myalgia[3].  (Tr. 141).

On September 21, 2000, plaintiff was taken by ambulance to St. Mary's Hospital due to chest pain.   (Tr. 135).   Jorge J. Hernandez, M.D., performed a left heart catheterization and discovered mild left ventricular systolic dysfunction[4] and severe

---

[1]Hyperglycemia is an excess of sugar in the blood.  Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/hyperglycemia (last viewed August 14, 2009).

[2]Irritable Bowel Syndrome, or "IBS", is a chronic functional disorder of the colon characterized by diarrhea or constipation, abdominal pain or discomfort and bloating.  Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/irritable bowel syndrome (last viewed August 14, 2009).

[3]Myalgia refers to "pain in one or more muscles."  Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/myalgia (last viewed August 14, 2009).

[4]The term "systolic" refers to the contraction of the heart by which the blood is forced onward and the circulation is kept up.  Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/systolic (last viewed August 14, 2009).

triple vessel coronary artery disease.[5]  (Tr. 344-45).  Dr. Hernandez referred plaintiff

for emergency coronary artery bypass grafting surgery.  (Tr. 345).

While hospitalized, plaintiff was seen by Korgi V. Hegde, M.D., on September 23,

2000.  Plaintiff complained of shortness of breath.  Plaintiff admitted that she was a

heavy smoker, but claimed to have cut back to less than one pack of cigarettes per

day.  (Tr. 139).  Dr. Hegde noted that he had treated plaintiff in the past because of

exacerbation of chronic obstructive pulmonary disease (COPD)[6] and asthma, but noted

that plaintiff's lung disease had improved following treatment.  (Tr. 139).  Dr. Hegde

found plaintiff to be in "mild respiratory distress".  (Tr. 139).  He diagnosed plaintiff

with exacerbation of chronic obstructive lung disease.  (Tr. 140).  Dr. Hegde also noted

an acute pulmonary edema, likely due to the resorption of fluid following plaintiff's

surgery.  (Tr. 140).  Plaintiff's blood pressure was measured at 110/70.[7]  (Tr. 139).

Plaintiff was discharged from St. Mary's Hospital on September 27, 2000.  (Tr.

136).  Just two days later, plaintiff presented at Forest Park Hospital with complaints

of a feeling of heaviness in her chest, shortness of breath with wheezing, nausea and

weakness.  (Tr. 136).  Plaintiff complained of pain in her right leg.  (Tr. 136).  Plaintiff

---

[5]Coronary artery disease, also known as coronary heart disease, is a
condition that "reduces the blood flow through the coronary arteries to the heart
muscle, and often results in chest pain or heart damage."  Merriam-Webster's
Online Medical Dictionary, at http://merriam-webster.com/medical/coronary artery
disease (last viewed August 14, 2009).

[6]Chronic Obstructive Pulmonary Disease, or "COPD", is a pulmonary disease
such as emphysema or chronic bronchitis, that is characterized by airway
obstruction resulting in a slowed rate of exhalation.  Meriam-Webster's Online
Medical Dictionary, at http://meriam-webster.com/medical/chronic obstructive
pulmonary disease (last viewed August 14, 2009).

[7]When written as a fraction, a blood pressure measurement provides the
systolic measurement as the numerator and the diastolic measurement as the
denominator.  The numbers represent millimeters of mercury.  Meriam-Webster's
Online Medical Dictionary, at http://meriam-webster.com/medical/blood pressure
(last viewed August 14, 2009).

–6–

was admitted to the hospital and was seen by Dr. Brown. (Tr. 136). Dr. Brown noted tenderness on plaintiff's right side. (Tr. 136). An EKG showed normal sinus rhythm. (Tr.137). Plaintiff's leg pain improved with pain medication and plaintiff's breathing was also improved. (Tr. 137-38). Plaintiff was discharged on October 3, 2000, with diagnoses of COPD, irritable bowel syndrome, congestive heart failure[8], migraine headache, hypertension[9] and hyperlipidemia[10]. (Tr. 136).

Plaintiff saw Dr. Brown on October 12, 2000. (Tr. 135). Plaintiff was doing well with the exception of pain in the right calf. (Tr. 135). Plaintiff also complained of chest pain when taking a deep breath. (Tr. 135). Plaintiff's blood pressure was measured at 160/90. (Tr. 135). Plaintiff was diagnosed with a hematoma[11] of the left toe and hypertension. (Tr. 134). Plaintiff again visited Dr. Brown on November 13, 2000, with pain in her left little toe. (Tr. 134). Dr. Brown noted mild swelling in the toe, but indicated that it did not appear to be due to arthritis. (Tr. 134). Dr. Brown recommended that plaintiff make an appointment with her cardiologist, Dr. Hernandez. (Tr. 346).

---

[8]Congestive Heart Failure refers to heart failure "in which the heart is unable to maintain adequate circulation of blood in the tissues of the body." Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical / congestive heart failure (last viewed August 14, 2009).

[9]Hypertension ("HTN") is a "condition with abnormally high blood pressure, with a systolic blood pressure reading of 140 mm Hg or greater, or a diastolic blood pressure of 90 m Hg or greater." Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/hypertension (last viewed August 14, 2009).

[10]Hyperlipidemia is "the presence of excess fat or lipids in the blood". Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/ medical/hyperlipidemia (last viewed August 14, 2009).

[11]A hematoma is a "mass of usually clotted blood that forms in a tissue, organ, or body space as a result of a broken blood vessel." Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/hematoma (last viewed August 14, 2009).

On November 15, 2000, plaintiff saw Dr. Hernandez, who noted that plaintiff was "doing well" from a cardiovascular point of view. (Tr. 346). Dr. Hernandez indicated that plaintiff's blood pressure was 180/80 and her heart rate was measured at 70 beats per minute. (Tr. 346). Examination of plaintiff's feet revealed "a very purplish type 5th toe on the left foot". (Tr. 346). Additionally, there was ecchymosis[12] of the second, third, and fourth toes. (Tr. 346). Dr. Hernandez diagnosed plaintiff with blue toe syndrome, likely caused by anti-coagulation medication plaintiff had been taking. (Tr. 346). Dr. Hernandez noted that he would discuss discontinuing the medication with plaintiff's other physicians. (Tr. 346). Dr. Hernandez prescribed Norvasc[13] for plaintiff to help with her blood pressure. (Tr. 346).

On November 16, 2000, plaintiff saw Ayaz Malik, M.D., for an examination of her toe. (Tr. 228). Plaintiff claimed that the pain was worsening. (Tr. 228). Plaintiff denied chest pains, shortness of breath or fever. (Tr. 228). Upon exam, Dr. Malik found plaintiff's fifth toe to be a dark purple in color with blisters. (Tr. 229). Dr. Malik agreed with Dr. Hernandez's assessment that plaintiff was likely suffering from blue toe syndrome. (Tr. 229). On November 27, 2000, Dr. Malik noted that plaintiff's toe was "markedly less painful" and was improving. (Tr. 226). On December 21, 2000, Dr. Malik noted that plaintiff was "doing well". (Tr. 225). Plaintiff indicated that she

---

[12]The term ecchymosis refers to the "escape of blood into the tissues from ruptured blood vessels marked by a livid black-and-blue or purple spot". Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/ecchymosis (last viewed August 14, 2009).

[13]Norvasc is indicated for the treatment of hypertension and coronary artery disease. See Phys. Desk Ref. 2546 (61st ed. 2007).

was not having any pain when resting.  (Tr. 225).  Her left toes were healed.  (Tr. 225).  Plaintiff continued to have some claudication[14] in her calves.  (Tr. 225).

Plaintiff saw Dr. Brown on January 19, 2001.  (Tr. 133).  Other than experiencing some chest pain, she had no complaints. (Tr. 133).  Plaintiff weighed 138 pounds and told Dr. Brown that she had run up and down the basement stairs without pain. (Tr. 133).  Plaintiff's blood pressure was 140/70. (Tr. 133).  Plaintiff's diagnoses were arteriosclerotic[15] heart disease ("ASHD") and hypertension. (Tr. 133).  Dr. Brown cleared plaintiff to return to work part-time, so long as she avoided heavy lifting or exertion. (Tr. 133).

On February 14, 2001, plaintiff presented to Dr. Hernandez for a routine follow up. (Tr. 346).  Plaintiff was "doing very well". (Tr. 346).  Plaintiff complained of some aches and pains in her chest, but no angina. (Tr. 346).  Plaintiff's blood pressure was 180/85.  (Tr. 341).  Dr. Hernandez ordered an increase in plaintiff's Norvasc medication and requested to see plaintiff again in three months. (Tr. 341).

On March 12, 2001, plaintiff visited Dr. Malik with pain in her left ankle. (Tr. 224).  Dr. Malik noted no significant edema.[16] (Tr. 224).  Examinations of plaintiff's heart and lungs were unremarkable. (Tr. 224).  Plaintiff was not having any chest

---

[14]Intermittent claudication refers to a "cramping pain and weakness in the legs and especially the calves."  The pain usually disappears after rest and is often associated with an inadequate blood supply to the muscles.  Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/intermittent+ claudication (last viewed August 14, 2009).

[15]Arteriosclerosis refers to abnormal thickening and hardening of the arterial walls.  Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/ medical/arteriosclerosis (last viewed August 14, 2009).

[16]An edema is an "abnormal excess accumulation of serous fluid in connective tissue or in a serous cavity."  Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/edema (last viewed August 14, 2009).

pain. (Tr. 224). Plaintiff was advised to take some over the counter pain medication such as Advil or Aleve. (Tr. 224).

Plaintiff was seen at St. Mary's Hospital on March 13, 2001 for a peripheral arterial evaluation. (Tr. 284). Plaintiff complained of leg pain that worsened upon exertion. (Tr. 284). The findings of the examination were consistent with moderate claudication as a result of moderate arterial occlusive disease.[17] (Tr. 285).

Plaintiff was seen by Dr. Malik on March 22, 2001, with complaints of pain in her knees, legs, hips and back. (Tr. 223). Plaintiff did not appear in distress upon examination. (Tr. 223). Plaintiff claimed that she had quit smoking. (Tr. 223). Dr. Malik opined that plaintiff's pains were not related to any vascular insufficiency. (Tr. 223).

Plaintiff saw Dr. Brown on April 6, 2001. (Tr. 133). She complained of headaches, nasal congestion and pain between her eyes. (Tr. 133). Her blood pressure had increased to 200/100. (Tr. 133). Plaintiff's diagnosis remained hypertension. (Tr. 133).

On May 16, 2001, plaintiff saw Dr. Hernandez and denied any further episodes of chest pain. (Tr. 341). Dr. Hernandez noted that plaintiff's lungs were clear and her heart was beating a regular rate and rhythm. (Tr. 341). Her blood pressure was 170/80. (Tr. 341). Dr. Hernandez indicated that plaintiff was beginning to develop some symptoms of claudication. (Tr. 341). Plaintiff was instructed to continue her medications and return in three to four months. (Tr. 341).

---

[17]Arterial disease is characterized by intermittent claudication and by numbness and tingling in the lower extremities. It is caused by a narrowing or obstruction of an artery and reduces blood flow to the legs. http://meriam-webster.com/medical/arterial disease (last viewed August 17, 2009).

Plaintiff returned to see Dr. Hernandez on September 19, 2001. (Tr. 340-41). Dr. Hernandez noted that, "[s]ince the last time that she was seen, [plaintiff], from the cardiovascular point of view, is doing well." (Tr. 341). Dr. Hernandez noted that plaintiff's claudications were not bothering her as much as before. (Tr. 340). Her blood pressure was measured at 155/88. (Tr. 340). Plaintiff told Dr. Hernandez that her main problem was that she would occasionally have to help lift quadriplegic patients or protect them in the middle of seizures. (Tr. 341). Plaintiff requested that Dr. Hernandez impose a weight limit so that she would not have to do such heavy exertion while at work. (Tr. 341). Dr. Hernandez's treatment notes do not indicate that plaintiff was put on any such restriction. (Tr. 340-41).

Plaintiff saw Dr. Hernandez on October 24, 2001 and November 14, 2001 for monitoring of her blood pressure. (Tr. 340). In October, plaintiff's systolic rate was 170. (Tr. 340). Dr. Hernandez ordered that plaintiff's Norvasc dosage be increased. (Tr. 340). By November, plaintiff's blood pressure was down to 140/88 and was, in Dr. Hernandez's opinion, "much better controlled". (Tr. 340).

On January 16, 2002, plaintiff presented to Dr. Hernandez with complaints of shoulder, back, chest, and left arm discomfort. (Tr. 339). Dr. Hernandez noted that he was given the impression that plaintiff desired a doctor's excuse from work for the entire week. (Tr. 339). Instead, Dr. Hernandez advised plaintiff to take off only the rest of the day. (Tr. 339). Plaintiff's blood pressure was 150/80 and she had a regular heart rate and rhythm. (Tr. 339).

On April 1, 2002, Dr. Malik noted that plaintiff was suffering from progressively worsening claudication. (Tr. 221). Plaintiff complained of edema in her left leg. (Tr. 221). On April 5, 2002, plaintiff underwent an arteriogram procedure which found that

plaintiff suffered from stenosis[18] of the left common femoral artery. (Tr. 274). Plaintiff presented for a stress test on May 1, 2002, the results of which did not suggest ischemia.[19] (Tr. 271). There were no diagnostic EKG changes during the procedure. (Tr. 272).

Plaintiff was scheduled for revascularization[20] surgery at St. Mary's Health Center on May 7, 2002. (Tr. 232). Plaintiff underwent bilateral iliac artery angioplasties[21] and stents and left common femoral artery endarterectomy[22] and patch repair. (Tr. 232). Following the procedure, treatment notes indicated a "very excellent satisfactory cosmetic result with no significant residual stenosis." (Tr. 270). On May 13, 2002, Dr. Malik noted that plaintiff was "doing quite well" post surgery. (Tr. 219). She was in no distress. (Tr. 219). Plaintiff did not have pain in her feet or in her calves upon walking. (Tr. 219).

On May 20, 2002, plaintiff saw Dr. Brown, who indicated that plaintiff's symptoms had "much improved." (Tr. 132). Plaintiff stated that she felt better. (Tr. 132). Although plaintiff had told Dr. Malik in March 2001 that she had stopped smoking, treatment notes from this visit with Dr. Brown indicate that she was still

---

[18]A stenosis is a stricture of any canal. Stedman's Med. Dict. 1673 (26th ed. 1995)

[19]Ischemia is local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply. Stedman's Med. Dict. 894 (26th ed. 1995).

[20]Revascularization refers to "a surgical procedure for the provision of new, augmented, or restored blood supply to a body part or organ. http://meriam-webster.com/medical/revascularization (last viewed August 17, 2009).

[21]The surgical repair of a blood vessel. http://meriam-webster.com/medical/angioplasties (last viewed August 17, 2009).

[22]The surgical "removal of the inner layer of an artery when thickened or occluded. http://meriam-webster.com/medical/endarterectomy (last viewed August 17, 2009).

smoking.  (Tr. 132).  Dr. Brown instructed plaintiff that it was "absolutely imperative" that plaintiff stop smoking.  (Tr. 132).  Plaintiff's blood pressure was 150/80.  (Tr. 132).  Plaintiff's diagnoses were chronic bronchitis and arteriosclerotic vascular disease.  (Tr. 132).

On May 22, 2002, plaintiff saw Dr. Hernandez, who noted that plaintiff remained "cardiovascularly asymptomatic".  (Tr. 339).  Plaintiff's blood pressure was 125/70.  (Tr. 339).  Examination of plaintiff's extremities revealed no edema.  (Tr. 339).  A few days later, plaintiff presented to the Forest Park Hospital with complaints of leg pain and swelling.  (Tr. 265).  No abnormalities were seen upon examination on either leg.  (Tr. 265).  A Doppler examination performed on June 3, 2002, however, indicated moderate arterial disease in the left leg.  (Tr. 259).  On June 10, 2002, Dr. Malik noted that, while plaintiff was still having problems with claudication in her left calf, the symptoms on the right leg has "completely resolved".  (Tr. 217).

On July 22, 2002, plaintiff presented without any specific complaints to Dr. Malik.  (Tr. 216).  Plaintiff did report that her right leg continued to swell at the end of each day.  (Tr. 216).  Plaintiff indicated that she was having no difficulties walking.  (Tr. 216).  She informed Dr. Malik that she had visited the Science Center and walked up and down the stairs the day before, without experiencing any signs of claudication.  (Tr. 216).  Plaintiff indicated that she was no longer smoking.  (Tr. 316).  Dr. Malik felt that plaintiff was doing well overall and "much better" since her last visit.  (Tr. 216).

At her appointment with Dr. Hernandez on September 18, 2002, plaintiff was noted to be developing claudication in her left leg again.  (Tr. 338).  Examination of the extremities revealed 2+ edema.  (Tr. 338).  Plaintiff's blood pressure was 130/80.  (Tr. 338).  As far as her cardiovascular health was concerned, treatment notes indicate that she was without problems.  (Tr. 338).

Treatment notes indicate that, on January 24, 2003, plaintiff was "doing very well" during her appointment with Dr. Malik. (Tr. 215). She was not having any pain in her leg during rest or movement. (Tr. 215). Plaintiff denied chest pains, shortness of breath, or any fevers. (Tr. 215). She did complain of left shoulder pain. (Tr. 215). Plaintiff's legs had no edema. (Tr. 215). Dr. Malik described plaintiff's arterial insufficiency as "stable". (Tr. 215). Dr. Malik noted that plaintiff no longer presented any clinical symptoms of the disease. (Tr. 215).

Plaintiff called Dr. Brown's office on February 19, 2003, with complaints of sleep disturbance and soreness on her right side resulting from a fall earlier in the week. (Tr. 131). Plaintiff stated that she had not taken any over the counter medications. (Tr. 131). Dr. Brown advised plaintiff to go to the emergency room if her symptoms persisted, but plaintiff refused. (Tr. 131). That same day, plaintiff returned to Dr. Hernandez's office for a follow up appointment. (Tr. 337). Plaintiff told Dr. Hernandez that she had been lightheaded earlier in the week and had fallen and hurt her shoulder and pelvis. (Tr. 337). Plaintiff claimed that the pains were decreasing and that she was able to walk better. (Tr. 337). Plaintiff's blood pressure was measured at 150/80. (Tr. 337). Dr. Hernandez noted that plaintiff had "improved clinically". (Tr. 337).

On February 21, 2003, plaintiff was seen by Dr. Brown for complaints of a cough and fever lasting two weeks. (Tr. 131). Plaintiff also complained of pain in her left shoulder and arm, along with numbness in her left thumb. (Tr. 131). Plaintiff told Dr. Brown that the clients at her work often pulled on her arms. (Tr. 131). Dr. Brown examined plaintiff's shoulder and noted that it had a decreased range of motion. (Tr. 131). Dr. Brown diagnosed plaintiff with bronchitis and left shoulder pain, possibly from a rotator cuff injury. (Tr. 131).

On April 14, 2003, plaintiff saw Dr. Malik for a follow up appointment. (Tr. 213). Treatment notes indicate that plaintiff was "doing well". (Tr. 213). She was walking without any claudication. (Tr. 213). Plaintiff denied experiencing chest pain or shortness of breath. (Tr. 213). Both of plaintiff's legs had mild to moderate edema, although plaintiff was doing "very well" overall. (Tr. 213). Plaintiff was to continue her medications and follow up with Dr. Malik in six months. (Tr. 213).

Plaintiff was also "doing very well" during her appointment with Dr. Hernandez on June 11, 2003. (Tr. 336). Dr. Hernandez found that plaintiff continued to be asymptomatic, "cardiovascularly speaking." (Tr. 336). Plaintiff was continuing to walk and noted "significant improvement." (Tr. 336). Plaintiff admitted that she continued to smoke, although claimed to have cut back some. (Tr. 336). Plaintiff's blood pressure was high, measuring at 190/100. (Tr. 336). Dr. Hernandez felt that plaintiff was merely anxious. (Tr. 336). However, a subsequent measurement indicated that plaintiff's blood pressure has risen to 205/110. (Tr. 336). Plaintiff admitted to Dr. Hernandez that she had not been taking her medication, mostly because of financial reasons. (Tr. 336). Dr. Hernandez gave plaintiff some sample medications (Norvasc, Toprol, and Lipitor) and asked her to return in two weeks to check her blood pressure. (Tr. 336). When she returned, on June 25, 2003, plaintiff's blood pressure had stabilized at 140/80. Dr. Hernandez reminded plaintiff that she must continue taking her medication, noting that her blood pressure is "very nicely controlled" when she does. (Tr. 336). On October 5, 2003, plaintiff again presented to Dr. Hernandez for a follow up appointment. (Tr. 335). Plaintiff has no cardiovascular problems. (Tr. 335). Her blood pressure was 170/80. (Tr. 335). Her legs had no edema. (Tr. 335).

On October 13, 2003, Dr. Malik found that plaintiff was not having any claudication or ischemic type rest pain. (Tr. 207). Doppler examinations were

satisfactory.  (Tr. 207).  Plaintiff was cleared to return to work with "no restrictions".  (Tr. 208).

Plaintiff saw Dr. Brown on November 21, 2003, with complaints of right heel pain and a cough.  (Tr. 130).  Plaintiff was diagnosed with plantar fascitis and prescribed Celebrex.  (Tr. 130).  A few days later, on November 26, 2003, plaintiff presented to Dr. Malik with complaints of right thigh pain.  (Tr. 248).  Dr. Malik noted that plaintiff's pain was not consistently related to her ambulation.  (Tr. 248).  Tests indicated that plaintiff might have right iliac artery stenosis with claudication and mild arterial insufficiency on her left side.  (Tr. 249).  On December 19, 2003, Dr. Malik noted that plaintiff was "doing well".  (Tr. 206).  Plaintiff indicated that she was only smoking occasionally and was trying to stop.  (Tr. 206).  She was not having any weight gain or loss.  (Tr. 206).  She was walking without pain.  (Tr. 206).  Plaintiff did report some tightness in her right thigh when she was "on her feet" for too long.  (Tr. 206).  Dr. Malik, however, found that plaintiff's complaints of tightness or pain were not directly related to how far she walked.  (Tr. 206).  In Dr. Malik's opinion, plaintiff's vascular status was stable.  (Tr. 206).  Plaintiff did not demonstrate "any evidence of worsening or progression of disease at the moment."  (Tr. 206).  Plaintiff was asked to return in one year.  (Tr. 206).

Plaintiff saw Dr. Brown on April 9, 2004, with intermittent claudication symptoms.  (Tr. 130).  Plaintiff also reported right heel pain.  (Tr. 130).  Nevertheless, plaintiff was "doing well" and indicated that she was planning a trip to Italy.  (Tr. 130).  Plaintiff's diagnoses were intermittent claudication and plantar fascitis.  (Tr. 130).  She was to return in four months.  (Tr. 130).

Plaintiff presented to Dr. Hernandez on April 21, 2004 to follow up on her hypertension.  (Tr. 335).  Plaintiff's blood pressure was 170/80.  (Tr. 335).  Plaintiff's

heart rate was regular. (Tr. 335). Her legs did not have edema. (Tr. 335). Plaintiff returned to Dr. Hernandez's office on October 20, 2004, with complaints of coughing and wheezing for the past several days. (Tr. 335). Plaintiff also claimed that she had shortness of breath, but denied any chest pain. (Tr. 335). Plaintiff was doing well from the cardiovascular point of view. (Tr. 335). Her blood pressure was measured at 170/80. (Tr. 333). An examination of plaintiff's extremities revealed no edema. (Tr. 333). However, due to plaintiff's severe wheezing, Dr. Hernandez felt that plaintiff should go to the emergency room for inhalation therapy. (Tr. 333).

Plaintiff was taken to Forest Park Hospital for her wheezing and shortness of breath. (Tr. 168-72). Plaintiff was diagnosed with chronic obstructive pulmonary disease/asthma exacerbation, hypertension, coronary artery disease, peripheral vascular disease, a history of depression, and diabetes mellitus type 2. (Tr. 168). Plaintiff reported that it had been six years since she had suffered an asthma attack. (Tr. 168). She stated that she did not take daily medication for asthma control. (Tr. 168). Plaintiff reported smoking two to three cigarettes per day when she is stressed. (Tr. 168). Plaintiff was discharged on October 22, 2004 in stable condition. (Tr. 168).

Plaintiff saw Dr. Hegde on October 29, 2004. (Tr. 321). Plaintiff's lungs were clear and her heart rate was regular. (Tr. 321). Plaintiff's diagnoses remained COPD and asthma. (Tr. 320). However, Dr. Hegde noted that plaintiff was "stable and doing well". (Tr. 320).

Plaintiff was seen by Dr. Hernandez in November 2004 and remained asymptomatic, cardiovascularly speaking. (Tr. 333). Plaintiff's blood pressure was 148/80. (Tr. 333). Plaintiff was "feeling well" and was improved from her last visit. (Tr. 333). Treatment notes indicate that plaintiff's lungs were clear and her heart rate

was regular. (Tr. 333). Dr. Hernandez indicated that plaintiff's hypertension was "fairly well controlled." (Tr. 333). Plaintiff was to return in six months. (Tr. 333)

On November 5, 2004, plaintiff presented to Dr. Brown without any complaints of chest pain or dyspnea. (Tr. 129). Her blood pressure was measured at 130/80 and she did not have a cough. (Tr. 129). Plaintiff reported that she had stopped smoking. (Tr. 129). Plaintiff's diagnoses were chronic bronchitis and steroid-induced diabetes. (Tr. 129).

Plaintiff presented at the Forest Park Hospital emergency room on November 30, 2004 with complaints of left ankle pain and swelling. (Tr. 160). Plaintiff reported that she had fallen from a ladder and twisted her ankle. (Tr. 160). Plaintiff was diagnosed with a nondisplaced fracture and was told to keep her leg elevated. (Tr. 160). Plaintiff was advised to follow up with an orthopedic specialist within a few days. (Tr. 160).

On December 1, 2004, plaintiff saw Clayton Perry, M.D., for examination of her ankle. (Tr. 155). Dr. Perry noted a lot of swelling in the ankle and opined that plaintiff suffered from a minimally displaced fracture. (Tr. 155). Plaintiff was advised to use a cam walker and to bear weight as tolerated. (Tr. 155). Plaintiff returned to Dr. Perry's office for a follow up appointment on December 22, 2004. (Tr. 154). Plaintiff reported that she had been bearing weight on the leg as tolerated. (Tr. 154). She was wearing a brace. (Tr. 154). Plaintiff reported that she was "much more comfortable". (Tr. 154). X-rays indicated that the fracture was still undisplaced. (Tr. 154).

Treatment notes indicate that plaintiff presented to Dr. Brown on January 14, 2005 with a cough and wheezing. (Tr. 128-29). Dr. Brown opined that plaintiff had developed bronchitis. (Tr. 129). Plaintiff was prescribed Levaquin and Combivent. (Tr. 128). That same day, plaintiff presented to Dr. Perry for a follow up on her ankle.

(Tr. 153).  The fracture site was "minimally tender".  (Tr. 153).  X-rays failed to indicate any change in healing.  (Tr. 153).  Plaintiff was told that she could return to work in three days, with her only restriction being that she sit down for fifteen minutes every two hours.  (Tr. 153).

### B.    Treatment Notes Subsequent to Alleged Onset Date

Plaintiff alleges that her disability began on March 3, 2005.  (Tr. 88).  Treatment notes subsequent to that date indicate that plaintiff presented to Dr. Brown on April 8, 2005 without wheezing or calf pain.  (Tr. 127).  Her weight was 165 pounds and her blood pressure measured 170/80.  (Tr. 127).  Plaintiff reported that she quit her job due to lack of support from her boss.  (Tr. 127).  Plaintiff's diagnoses were hypertension and chronic bronchitis.  (Tr. 127).  Plaintiff was advised to seek more medication from Dr. Hernandez to control her blood pressure.  (Tr. 127).

On May 18, 2005, plaintiff was seen by Dr. Hernandez, who once again found that plaintiff displayed no symptoms of any cardiovascular problems.  (Tr. 333). Plaintiff's blood pressure was 150/84, which in Dr. Hernandez's opinion was "very well controlled".  (Tr. 333).  Plaintiff's lungs were clear and her heart rate was regular.  (Tr. 333).  Plaintiff was to return in six months.  (Tr. 334).

Plaintiff also saw Dr. Perry on May 18, 2005, for an examination of her ankle that she had fractured five months earlier from falling off a ladder.  (Tr. 152).  Plaintiff was walking without a limp.  (Tr. 152).  Plaintiff complained of swelling in her feet. (Tr. 152).  On examination, Dr. Perry found that plaintiff's range of motion was identical in both ankles.  (Tr. 152).  Dr. Perry indicated that plaintiff displayed a "lack of symptoms".  (Tr. 152).  He assessed her permanent impairment as being 0%.  (Tr. 152).  Plaintiff was told to continue her activities as tolerated and return on an as

needed basis. (Tr. 152). The treatment notes are void of any further appointments plaintiff had with Dr. Perry.

On May 20, 2005, an arterial Doppler examination indicated that plaintiff had "very mild arterial disease" in both legs. (Tr. 201). On June 2, 2005, plaintiff presented to Dr. Malik and indicated that she had been stressed at work and had quit. (Tr. 200). She reported that she was applying for disability benefits. (Tr. 200). Plaintiff complained of pain in her legs when walking. (Tr. 200). Plaintiff claimed that she was unable to walk long distances without pain. (Tr. 200). Additionally, plaintiff claimed that she experienced pain in her legs even during rest. (Tr. 200). Dr. Malik felt that some of these pains were due to plaintiff's edema, which was being treated by Dr. Hernandez. (Tr. 200). Dr. Malik found no reason to believe that plaintiff's pains were related to any arterial insufficiency. (Tr. 200). Dr. Malik also noted that, while plaintiff had recently experienced wheezing and exacerbation of her asthma, it was back "to her baseline" at the time of the appointment. (Tr. 200). Dr. Malik asked plaintiff to return for another arterial Doppler examination in one year. (Tr. 200).

On June 28, 2005, Dr. Brown completed a form indicating that plaintiff suffered from coronary artery disease, asthma, peripheral vascular disease with intermittent claudication, hypertension, irritable bowel syndrome. (Tr. 124). On July 5, 2005, plaintiff called Dr. Brown with complaints of a pulled muscle in the middle of her back. (Tr. 127). Plaintiff was advised to take Advil and was prescribed Darvocet.[23] (Tr. 127). On July 18, 2005, plaintiff indicated to Dr. Brown that the medication had helped with her back pain, although she was still sore. (Tr. 127). Treatment notes indicate that plaintiff weighed 166 pounds. (Tr. 127). Dr. Brown noted tenderness in

_____

[23]Darvocet is a centrally acting narcotic analgesic agent indicated for relief from mild to moderate pain. It can produce dependence. See Phys. Desk Ref. 3497 (60th ed. 2006).

the right lower thoracic spine and over the right lower ribs.  (Tr. 126).  An x-ray of the lumbar spine on July 22, 2005 revealed mild degenerative disc space with minimal spurring.  (Tr. 150).  No acute fractures or infiltrating lesions were seen.  (Tr. 150).

Treatment notes indicate that, on September 21, 2005, plaintiff presented to Barbara Caciolo, M.D., with complaints of muscle and joint pain.  (Tr. 120).  Plaintiff claimed that she hurt "all of the time".  (Tr. 120).  Plaintiff was currently taking Caduet, Topuel, Asmacort and Combivent.  (Tr. 120).  Plaintiff admitted that she still smoked at times.  (Tr. 120).  Plaintiff noted that she was unable to work since March 2005 and was pursuing disability.  (Tr. 120).  Plaintiff's blood pressure was 148/90. (Tr. 121).  Dr. Caciolo diagnosed plaintiff with joint pain, muscle pain, osteoarthritis, neck pain, and fibromyalgia.[24]  (Tr. 121).  Dr. Caciolo saw plaintiff again on September 27, 2005 and diagnosed plaintiff with diabetes mellitus uncontrolled.  (Tr. 118).

Treatment notes indicate that, on October 5, 2005, plaintiff reported fewer aches and pains.  (Tr. 118).  Her blood pressure was 170/80.  (Tr. 118).  She indicated that her medication was helping.  (Tr. 118).  Plaintiff reported sleep disturbance and complained that her hands cramped up when she used them regularly.  (Tr. 119).  She also complained of muscle spasms in her feet.  (Tr. 119). On October 21, 2005, Dr. Brown opined that the medication had "good control" over plaintiff's diabetes mellitus.  (Tr. 115).  Plaintiff was told to continue her medications. (Tr. 115).

_____

[24]Fibromyalgia is a "chronic disorder characterized by widespread pain, tenderness, and stiffness of muscles and associated connective tissue structures that is typically accompanied by fatigue, headache, and sleep disturbances." http://meriam-webster.com/medical/fibromyalgia (last viewed August 17, 2009).

Plaintiff presented to Dr. Hernandez on November 16, 2005, with complaints of chest tightness and discomfort. (Tr. 108). Plaintiff's blood pressure was 140/80 and her lungs were clear. (Tr. 108). Overall, Dr. Hernandez noted that plaintiff was doing "very well" and had not had any further episodes of claudications. (Tr. 108). Dr. Hernandez noted that plaintiff's lab results were "excellent". (Tr. 109). Treatment notes from Dr. Caciolo on the same date indicate that plaintiff's medication was working for her diabetes. (Tr. 114). The medicine was also helping control plaintiff's pains from her fibromyalgia, although she still had pains at times, especially when stressed. (Tr. 114).

On November 28, 2005, plaintiff presented to Dr. Brown with complaints of a bladder infection. (Tr. 115). Her bladder infection had resolved by December 5, 2005, when she saw Dr. Brown with complaints of a dull ache in her chest. (Tr. 115). Plaintiff's blood pressure was 160/78 and her lungs were clear. (Tr. 115). Plaintiff was to continue her medications and return in four months. (Tr. 115).

An echocardiogram was performed on December 13, 2005. (Tr. 110). The technician noted that the procedure was difficult to perform due to plaintiff's COPD. (Tr. 110). The echocardiogram showed probable normal left ventricular systolic function and decreased left ventricular diastolic compliance. (Tr. 110).

Treatment notes dated April 3, 2006 indicate that plaintiff had lost twelve pounds since December 2005. (Tr. 98). Plaintiff weighed 140 pounds. (Tr. 98). Plaintiff reported to be eating normally but had a loss in appetite. (Tr. 98). By April 11, 2006, plaintiff had lost more weight. (Tr. 100). Plaintiff complained of pain in the right lower quadrant. (Tr. 100). A colonoscopy indicated small external hemorrhoids. (Tr. 100). Treatment notes indicate that plaintiff suffered from anorexia and

constipation.  (Tr. 100).  Her diabetes mellitus was well controlled by medication.  (Tr. 100).

By May 5, 2005, plaintiff's reported that her abdominal pain was "better overall".  (Tr. 97).  Her blood pressure was 150/90.  (Tr. 97).  Plaintiff weighed 138 pounds, two pounds less than she weighed the month before.  (Tr. 97).  Plaintiff reported that she was still constipated.  (Tr. 97).  Plaintiff was to return in three months.  (Tr. 97).  Plaintiff received an excuse from jury duty on June 30, 2006 from Dr. Brown.  (Tr. 102).  Dr. Brown asked that plaintiff be excused "because her medical problems make it impossible to participate".  (Tr. 102).

An ultrasound performed on July 11, 2006, in response to plaintiff's complaint of right lower quadrant pain, showed no abnormality.  (Tr. 99).  An arterial Doppler examination indicated mild arterial disease on plaintiff's left side.  (Tr. 104).  No arterial disease was indicated for plaintiff's right side.  (Tr. 104).  Treatment notes also dated July 11, 2006, indicate that plaintiff was admitted to St. Mary's Health Center by Dr. Brown, with complaints of a one day history of cough, wheezing and shortness of breath.  (Tr. 349).  Plaintiff stated that she had smoked approximately one pack of cigarettes per day for thirty years.  (Tr. 349).  Plaintiff's blood pressure was 120/80.  She was assessed with exacerbation of COPD, diabetes mellitus, hypertension, and coronary artery disease which was stable.  (Tr. 350-51).

On July 27, 2006, plaintiff presented to Dr. Malik with complaints of sharp, shooting pain in her feet.  (Tr. 103).  Plaintiff also claimed that her feet cramp up making it difficult to walk.  (Tr. 103).  She also described pain in the muscles of her thigh, calf, arms, shoulders and back.  (Tr. 103).  Plaintiff also reported chest pains.  (Tr. 103).  Plaintiff appeared in no distress upon physical examination.  (Tr. 103).  Dr. Malik believed that plaintiff's "pains are mostly related to arthritis and fibromyalgia but

also some probably due to neuropathy in her feet". (Tr. 103). Dr. Malik noted that the latest arterial Doppler examinations showed "quite satisfactory" flow to her lower extremities. (Tr. 103). Dr. Malik congratulated plaintiff upon hearing her say that she had quit smoking. (Tr. 103).

Plaintiff was seen by Dr. Brown on August 4, 2006. (Tr. 97). She had gained seven pounds and was eating better. (Tr. 97). She complained of nausea and constipation. (Tr. 97). Plaintiff was diagnosed with irritable bowel syndrome with constipation and asthmatic bronchitis. (Tr. 97). Dr. Brown also completed a form that day, noting that plaintiff suffered from COPD, coronary artery disease, asthma, asthmatic bronchitis, hypertension, irritable bowel syndrome, chronic constipation, and peripheral vascular disease with intermittent claudication. (Tr. 101). Dr. Brown stated that plaintiff "is totally disabled due to [her] conditions, mainly the vascular disease." (Tr. 101). Dr. Brown noted that plaintiff could only walk ten feet without rest. (Tr. 101).

## IV. The ALJ's Decision

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 21, 2010.

2. The claimant has not engaged in substantial gainful activity since March 3, 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments: osteoarthritis of the hands, arms, feet, and legs and back (20 CFR 404.1520©).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift 10 pounds

frequently and 20 pounds occasionally and to sit, stand and/or walk about six hours total in an eight-hour workday.

6.    The claimant is capable of performing past relevant work as an activities director, as that job is generally performed in the national economy. Such work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a "disability," as defined in the Social Security Act, from March 3, 2005 through the date of this decision (20 CFR 404.1520(f)).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv., 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability

to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A.   Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.   the ALJ's credibility findings;

2.   the plaintiff's vocational factors;

3.   the medical evidence;

4.      the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.      third-party corroboration of the plaintiff's impairments; and

6.      when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

## B.      Plaintiff's Allegations of Error

Plaintiff contends that the ALJ failed to properly consider her residual functional capacity.      Specifically, plaintiff contends that the residual functional capacity determination was based on an erroneous determination of the severity of plaintiff's impairments.  Plaintiff claims that this determination was erroneous because, in part, the ALJ did not properly consider the opinion of Dr. Brown, one of plaintiff's treating physicians.  Finally, plaintiff contends that the hypothetical question posed to the vocational expert was flawed.

### 1.  Residual Functional Capacity

It is the duty of the ALJ to determine plaintiff's RFC after considering all relevant evidence. See Lauer v. Apfel, 245 F.3d 700, 703-704 (8th Cir. 2001).  However, "[a] claimant's residual functional capacity is a medical question."  Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).  Thus, while the ALJ must consider all relevant evidence, at

least "some medical evidence" must support the residual functional conclusions of the ALJ.  See Lauer, 245 F.3d at 704.

The RFC of a claimant is "the most that she [is] capable of doing despite the combined effects of both her severe and non-severe medically determinable impairments."  Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).  Thus, even though the ALJ found that several of plaintiff's impairments were not severe, the ALJ was still required to consider any limitations imposed by them.[25]

The ALJ found that plaintiff retained the RFC to lift ten pound frequently and twenty pounds occasionally.  (Tr. 15).  The ALJ also found that plaintiff could sit, stand and/or walk for about six hours of an eight hour workday.  (Tr. 15).  The ALJ found that plaintiff's complaints of severe pain and respiratory difficulties were not credible. (Tr. 15-16).  Plaintiff contends that the RFC determination did not fully appreciate the limitations imposed upon plaintiff by all of her impairments in combination.

Upon a review of the record as a whole, the Court finds that substantial evidence supports the ALJ's findings relating to the severity of plaintiff's impairments and the limitations imposed by them.   Likewise, substantial evidence supports the ALJ's residual functional capacity determination.

The medical evidence supports the ALJ's finding that plaintiff's coronary artery disease, peripheral vascular disease, diabetes mellitus, asthma, chronic constipation and chronic obstructive pulmonary disease, are not severe impairments.  The evidence

---

[25]The ALJ found that only plaintiff's osteoarthritis of the hands, arms, feet, legs and back was severe.  (Tr. 14).  None of plaintiff's other impairments, including coronary artery disease, peripheral vascular disease, diabetes mellitus, asthma, chronic constipation and chronic obstructive pulmonary disease, were found to be severe.  (Tr. 14).  Plaintiff contends that the ALJ erred in finding that these impairments were not severe.  The Court will evaluate whether the record supports such a decision within its analysis of plaintiff's residual functional capacity.

clearly establishes that plaintiff's coronary artery disease had resolved by March 3, 2005, the alleged onset date of plaintiff's disability. Treatment notes from Dr. Hernandez, plaintiff's treating cardiologist, indicate that plaintiff was "doing very well" following her November 2000 surgery. (Tr. 346). In September 2001, Dr. Hernandez noted that plaintiff was "doing well" from a cardiovascular point of view. (Tr.341). Plaintiff was without any symptoms of cardiovascular problems on May 18, 2005, just two months after plaintiff's alleged onset of disability. (Tr. 333). On that same date, Dr. Hernandez noted that plaintiff's blood pressure was "very well controlled" with medication. (Tr. 333). As of November 2005, Dr. Hernandez opined that plaintiff was doing "very well". (Tr. 108). No further treatment records from Dr. Hernandez are found within the record, and there is no indication that plaintiff's heart disease worsened since that time.

The record indicates that plaintiff's vascular disease also significantly improved. Dr. Malik, plaintiff's treating physician for this condition, found that plaintiff's "vascular status is stable". (Tr. 206). On May 20, 2005, plaintiff's arterial disease was described as "very mild." (Tr. 201). On June 2, 2005, the date of her first visit to Dr. Malik after filing for disability, plaintiff complained of pain in her legs and feet. (Tr. 200). However, Dr. Malik could find no connection between plaintiff's complaints of pain and her arterial disease. (Tr. 200). Indeed, Dr. Malik indicated that he did not believe plaintiff's pains were related to any arterial insufficiency. (Tr. 200). Again, on July 27, 2006, in response to plaintiff's complaints of pain, Dr. Malik found that the pains had nothing to do with her peripheral vascular disease. (Tr. 103). Instead, Dr. Malik opined that plaintiff's pains were mostly related to arthritis. (Tr. 103).

Likewise, the medical evidence establishes that plaintiff's diabetes mellitus is under control. On September 26, 2005, plaintiff's diabetes was full blown and

uncontrolled.  (Tr. 118).  However, by October 5, 2005, Dr. Brown found that the medications had good control of plaintiff's diabetes.  (Tr. 115).  Dr. Brown repeated his belief that plaintiff's diabetes was under control on October 21, 2005.  (Tr. 115). On November 16, 2005, Dr. Caciolo noted that plaintiff's medication was helping to control her diabetes.  (Tr. 114).  Again, on August 4, 2006, Dr. Brown indicated that plaintiff's diabetes mellitus was "controlled".  (Tr. 101).  Diabetes mellitus that is controlled by medication is not considered disabling.  See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

With regards to plaintiff's asthma and chronic obstructive pulmonary disease, the record once again establishes that the conditions are not severe.  From the onset date of March 3, 2005 forward, the record fails to show any continuous treatment for asthma or COPD.  In May 2005, just one month after the alleged onset date, it was noted by Dr. Malik that plaintiff had previous difficulties with wheezing and exacerbation of her asthma, but that it had since improved "back to her baseline". (Tr. 200).  Plaintiff was hospitalized briefly in July 2006 for an exacerbation of her COPD, although she was stable upon discharge.  (Tr. 349-51).  The remaining medical records do not indicate any further treatment for plaintiff's breathing problems.

It is also relevant that plaintiff continued to smoke throughout her treatment for these respiratory illnesses, despite being warned by her physicians that she needed to stop.  "The Eighth Circuit has held that an ALJ may properly discount a claimant's complaint of breathing problems when that claimant continues to smoke, despite the admonitions of her treating doctors to quit."  Harris-Steinhoff v. Astrue, 2008 WL 2789251 at *13 (citing Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)). Plaintiff admitted in her testimony that she had quit smoking only two months prior to the August 2006 hearing.  (Tr. 361).   Despite a warning from plaintiff's physician that

it was "absolutely imperative" for her to stop smoking, treatment notes indicated that plaintiff continued to smoke throughout the relevant time period. (Tr. 120, 132, 139, 168, 206, 336).

Finally, the record supports the ALJ's conclusion that plaintiff's chronic constipation did not constitute a severe impairment. Although plaintiff was diagnosed with constipation on several occasions, there is simply no medical evidence to support plaintiff's contention that it was a disabling impairment.

Plaintiff also contends that the ALJ erred in discounting the opinion of Dr. Brown that plaintiff is "totally disabled". On August 4, 2006, Dr. Brown indicated on a form that plaintiff was disabled "due to [her] conditions, mainly the vascular disease". (Tr. 101). The ALJ discredited Dr. Brown's opinion because it was inconsistent with the treatment notes, including Dr. Brown's own treatment notes. (Tr. 16).

"[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007). "[A]n ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial evidence contained within the record." Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000).

Upon a review of the record as a whole, the Court concludes that the ALJ properly discounted the August 4, 2006 opinion of Dr. Brown that plaintiff was "totally disabled," mainly due to her vascular disease. Dr. Brown's own treatment notes fail to support such a conclusion. Further, Dr. Brown's conclusion regarding the severity of plaintiff's vascular disease is directly contradicted by the treatment notes of Dr. Malik, the physician who treated plaintiff for her vascular disease. While Dr. Brown insists that the vascular disease is the main impairment totally disabling plaintiff, Dr.

-31-

Malik found that plaintiff's "vascular status [was] stable" as of December 2003. (Tr. 206). In May 2005, plaintiff's vascular disease was described as "very mild." (Tr. 201). Dr. Malik consistently found that plaintiff's subjective complaints of pain were not associated with her vascular disease. (Tr. 103, 200).

Dr. Brown's remaining August 4, 2006 conclusions are also contradicted by the record. Dr. Brown indicated that plaintiff could walk only ten feet without resting. (Tr. 101). However, when plaintiff completed her disability report on June 9, 2005, she indicated that she could walk fifty feet before needing rest. (Tr. 84). Plaintiff stated that she could walk up to one hundred feet without pain in her calves. (Tr. 88). There is no medical evidence within the record suggesting that plaintiff's impairments worsened from the time plaintiff completed her disability report to the time Dr. Brown submitted his statement. In fact, the record indicates the opposite; plaintiff's impairments had, for the most part, improved or been resolved by August 2006. Further, plaintiff was able to climb a ladder in November 2004, just four months prior to her alleging disability. (Tr. 129). There is no medical evidence to suggest that plaintiff's impairments worsened so drastically in that four-month period such that she could go from being capable of climbing a ladder to being incapable of walking a mere ten feet. The evidence as a whole supports the ALJ's decision to discount Dr. Brown's conclusory statement that plaintiff is "totally disabled".

Plaintiff also contends that the ALJ erred in failing to fully develop the record. An ALJ is "not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). The Court does not believe that the ALJ had a duty in this case to develop the record any further. Treatment notes are available dating as far back as

1992. The record contained ample evidence from several treating physicians from which the ALJ could make its determination.

Finally, the ALJ also found that plaintiff's subjective complaints of pain were not credible as to the intensity or frequency of such pain. (Tr. 15). Because plaintiff does not argue in her brief in support of the complaint that the ALJ erred in making this credibility determination, the Court will not examine the issue in depth. The Court does, however, believe that the ALJ's decision to discredit this portion of plaintiff's testimony complies with the requirements set forth in Polaski v. Heckler, 751 F.2d 943 (8th Cir. 1984).

The Court concludes that the ALJ properly determined plaintiff's residual functional capacity. Based on the record as a whole, substantial evidence supports the ALJ's finding that plaintiff could perform the physical requirements of light work, in which she may be required to lift ten pounds frequently and twenty pounds occasionally, and to sit, stand or walk about six hours total per day. Even after alleging disability, plaintiff twice indicated that she could lift up to twenty five pounds. (Tr. 84, 88). On September 19, 2001 plaintiff asked Dr. Hernandez to impose a weight limit so that she would not have to do heavy physical activity. (Tr. 341). The record is devoid of any mention of Dr. Hernandez imposing plaintiff's requested restriction. Further, none of plaintiff's physicians, other than Dr. Brown, indicated that plaintiff had any further work restrictions beyond those considered in the ALJ's residual functional capacity determination. In fact, the record indicates that plaintiff's physicians felt that plaintiff could return to work. In January 2002, Dr. Hernandez noted that plaintiff wanted him to excuse her from work for the entire week. (Tr. 339). Instead, Dr. Hernandez told her to take only one day off. (Tr. 339). On October 13, 2003, plaintiff was cleared by Dr. Malik to return to work with "no

restrictions." (Tr. 208). On January 14, 2005, less than two months prior to applying for disability, plaintiff was told by Dr. Perry that she could return to work. (Tr. 153). Plaintiff's permanent impairment in her ankle was assessed as being "0%." (Tr. 152). For all these reasons, the Court finds that the ALJ's determination of plaintiff's residual functional capacity is fully supported by substantial evidence on the record as a whole.

### 2. Vocational Expert Testimony

Plaintiff's final argument is that the ALJ erred by relying upon testimony from a vocational expert because such testimony was premised on a flawed hypothetical question. This argument is based almost entirely on the belief that the limitations as described by Dr. Brown should have been included in the hypothetical question. Because the Court has found that Dr. Brown's August 2006 opinion was inconsistent with the medical records in this case, the ALJ was not required to include any of the limitations described in Dr. Brown's statement in the question to the vocational expert.

Plaintiff also contends that, because the ALJ found that plaintiff's osteoarthritis was a severe impairment, the hypothetical question was required to include some limitations relating to plaintiff's ability to use her hands. Indeed, the ALJ found that plaintiff's osteoarthritis of the hands, arms, feet, legs and back was a severe impairment. (Tr. 14). The ALJ found that plaintiff was limited in that she could not lift more than ten pounds frequently or twenty pounds occasionally. The Court believes that such limitation reflects the ALJ's finding that plaintiff was limited by arthritis in her hands and arms, along with her feet, legs and back. The record as a whole does not support a finding that plaintiff suffered additional hand limitations.

### VI. Conclusion

Plaintiff alleges that she was unable to work due to her disabilities beginning on March 3, 2005. The extensive medical records in this case reflect that plaintiff has several impairments, many of which were severe at one point in time. However, the record as a whole indicates that plaintiff's overall condition had improved over time, with many of her impairments being resolved or controlled by medication. The fact that plaintiff was able to work, despite her impairments, prior to March 3, 2005, indicates that she would have been able to work after that date, since her overall condition had improved. For all the reasons discussed above, the Court finds that the Commissioner's decision that plaintiff is not disabled is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her complaint [#1] and her brief in support of complaint [#19] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT COURT

Dated this 8th day of September, 2009.